Pages 1 - 29

United States District Court

Northern District of California

Before The Honorable William Alsup

Microsoft Corporation,          )
                                )
            Plaintiff:          )
                                )
  vs.                           )          No. C08-5149 WHA
                                )
Webxchange, Incorporated,       )
                                )
            Defendant.          )
_____)

                                San Francisco, California
                                Thursday, February 12, 2009

**Reporter's Transcript Of Proceedings**

**Appearances**:

For Plaintiff:          Klarquist Sparkman, LLP
                        One World Trade Center, Suite 1600
                        121 S.W. Salmon Street
                        Portland, Oregon  97204
                   By:  **John D. Vandenberg, Esquire**
                        **Adam Randal Wichman, Esquire**


                        K&L Gates, LLP
                        Four Embarcadero Center, Suite 1200
                        San Francisco, California  94111
                   By:  **Holly Anne Hogan, Esquire**

For Defendant:          Kasowitz, Benson, Torres & Friedman LLP
                        1633 Broadway
                        New York, New York  10019
                   By:  **Lawrence Bennett Goodwin, Esquire**
                        **Peter Jonathan Toren, Esquire**

*Reported By:*          *Sahar McVickar, RPR, CSR No. 12963*
                        *Official Reporter, U.S. District Court*
                        *For the Northern District of California*

                   (Computerized Transcription By Eclipse)

```
 1   Thursday, February 12, 2009                    8:00 a.m.
 2                      P R O C E E D I N G S
 3             THE COURT:  Good morning, everyone.
 4             Be seated, please.
 5             Let's go to the Microsoft case first.
 6             THE CLERK:  Okay, Judge.  Thank you.
 7             Okay, civil action No. C08-5149 Microsoft
 8   Corporation versus Webxchange.
 9             THE COURT:  Let's have our appearances, please.
10             MR. TOREN:  Good morning, Your Honor.
11             Peter Toren on behalf of Webxchange.
12             THE COURT:  Peter?
13             MR. TOREN:  T-o-r-e-n, Your Honor.
14             THE COURT:  Very well.  Thank you.
15             MR. GOODWIN:  And Lawrence Goodwin.
16             THE COURT:  All right.  Good morning, to you.
17             And?
18             MR. VANDENBERG:  Good morning.
19             John Vandenberg for Microsoft.
20             THE COURT:  Okay.
21             MR. WICHMAN:  Adam Wichman for Microsoft.
22             MS. HOGAN:  Holly Hogan for Microsoft.
23             THE COURT:  This is Webxchange's motion.
24             MR. TOREN:  Yes, Your Honor.
25             THE COURT:  Go ahead, let's hear what you have to
```

```
 1   say.
 2             MR. TOREN:  Thank you, Your Honor.  Good morning.
 3             Well, first of all, Your Honor, Microsoft has
 4   admitted that there is no direct infringement in this case, so
 5   the Court really has to decide whether under the theory of
 6   inducement by infringement that Microsoft has demonstrated
 7   because, after all, it is Microsoft's burden, that it would
 8   only have subject matter jurisdiction if, under this theory of
 9   inducement, Microsoft has demonstrated under all of the
10   circumstances that there is a substantial controversy between
11   it and Webxchange which has a sufficient adverse legal interest
12   of sufficient immediacy and reality to warrant the issuance of
13   a declaratory judgment.
14             And we submit, Your Honor, that there is no evidence
15   in that regard at all.  The first time that Microsoft raised
16   the theory of inducement was in its opposition.  There is
17   nothing in the complaint that even suggests the theory of
18   inducement, nothing -- there is no other evidence at all that
19   suggests it.  And not only that, Microsoft, in its opposition,
20   even failed to discuss the necessary elements to establish
21   theory of inducement.
22             As Your Honor, I'm sure, is aware, to establish
23   theory of inducement, Microsoft must show, or Webxchange must
24   show that Microsoft actively induced a third party to infringe
25   one of Webxchange's patents with the intent to cause such an
```

1    infringement.  And under that standard, Microsoft has to have

2    had knowledge of patents as well as to actively induce it.

3          The only facts that we have here, Your Honor, are

4    that Webxchange has brought infringement actions against three

5    of -- three of Microsoft's customers that have allegedly used

6    Microsoft Visual Studios *(sic)* in Delaware actions.  Webxchange

7    does not allege, it has not alleged, there is no evidence that

8    the mere use of the Microsoft Visual Studio infringes its

9    patents.  The customers in Delaware have allegedly used

10   Microsoft Visual Studio to create other programs, other

11   systems, but the infringing, whether or not those systems

12   infringe, does not depend on Microsoft Visual -- Visual

13   Studios.  It depends upon how those customers and what they

14   have done with the Microsoft Visual Studio to create these

15   allegedly infringing systems.  So, the mere fact that

16   Webxchange has brought these actions in Delaware against

17   Microsoft customers is certainly not to create controversy in

18   this matter.

19          Also, that the -- let me say -- let me back up and

20   say that the only -- Microsoft in its opposition now brings

21   forth four facts that they claim somehow create inducement.

22   The first of that they claim is that Webxchange made an

23   argument about a compulsory counter-claim inducement in its

24   opening brief.  And they claim that we stated in our opening

25   brief that if the Court were to find -- the Court were to find

1   subject matter jurisdiction here, then Webxchange would be

2   forced to bring a compulsory counter-claim.  And web -- and

3   Microsoft has attempted to use that statement in our opening

4   brief to suggest that, in fact, they are -- that there is

5   allegations or there are grounds for Webxchange to sue, to sue

6   Microsoft.  But, what we actually said in our opening brief was

7   if the Court finds that there is subject-matter jurisdiction,

8   then that would give us the basis to bring a compulsory

9   counter-claim against -- against Microsoft.

10          But, the factor that Microsoft does not bring out is

11  that the compulsory counter-claim is based on this Court's

12  finding of jurisdiction.  Without the finding of such

13  jurisdiction there is no basis for Webxchange to bring a

14  counter-claim or any sort of claim against Microsoft.

15          **THE COURT:**  Wait a minute.

16          Do you -- are you prepared to state categorically

17  that the -- Microsoft does not induce infringement.

18          **MR. TOREN:**  I am prepared to state categorically

19  that the facts as we presently know them, there is no basis for

20  us to assert inducement against Microsoft.  I am willing to go

21  that far.  We have no evidence; we have nothing in our

22  possession and Webxchange's knowledge that there is anything --

23  that there are any facts on behalf that Microsoft is doing that

24  they actively engaged inducement, yes, Your Honor.

25          **THE COURT:**  Let me hear from the other side.  Thank

```
 1   you.
 2                    (Opposing counsel rises.)
 3           MR. TOREN:  The second --
 4           THE COURT:  Wait.
 5   What more do you have to say?
 6           MR. TOREN:  I think what --
 7           THE COURT:  Isn't all this covered in the brief?
 8           MR. TOREN:  I think pretty much everything I --
 9           THE COURT:  Well, I'm going to give you a chance to
10   do the rebuttal, but I am sort of inclined in your favor, given
11   that you are disavowing any allegations of inducement.  So I
12   want to hear what it is that Microsoft has to say that would
13   change my mind, and then I'll give you a chance to respond.
14           MR. TOREN:  Okay.  Thank you, Your Honor.
15           THE COURT:  Let's hear from Microsoft.
16       Why isn't that right?  Seems like you are just
17   trying to do one of these venue gimmicks.  Everyone knows that
18   our district is more -- at least we entertain the idea that a
19   patent is invalid, other districts won't do that.  So, people
20   like to sue in the district to get a patent invalidated.  That
21   is what it seems like you are doing.
22           Are you are making a big stretch here to try to find
23   some way in which to get venue here for tactical reasons?  And
24   they are not even accusing you of anything.
25           All right that's my speech.  Explain why that's
```

```
1    wrong.

2              MR. VANDENBERG:  Well, Your Honor, the essence is if

3    we continue our business as usual, which I'll clarify, we are

4    really betting part of the farm.  And there is two ways in

5    which we are being injured here.  One is inducement --

6              THE COURT:  They are disavowing --

7              MR. VANDENBERG:  They haven't --

8              THE COURT:  They said, based on what they know now,

9    they have no basis to sue for inducement.

10             MR. VANDENBERG:  Right, but the problem is that they

11   have taken actions which have raised a reasonable apprehension,

12   really.

13             THE COURT:  Look, if somebody sells hammers that

14   don't infringe anything but the people that use the hammers to

15   build something, that does infringe.  Then it's perfectly okay

16   to sue the people who do infringe.  But, to go back to the

17   people that build the hammer and say, wait a minute, you're

18   inducing, that's a big stretch.

19             MR. VANDENBERG:  Well, the problem we have here is

20   they have pointed to Microsoft on four occasions as being

21   essentially the source of the problem.  That there is four

22   facts that's raise this apprehension.  First --

23             THE COURT:  Tell me what those are.  I read your

24   stuff; I don't remember ever seeing four.  Where did they ever

25   say four?
```

1      **MR. VANDENBERG:**  Well, first of all, they came to

2   us, they approached us, put us on notice of these patents, and

3   they said the patents cover realtime transactions on the

4   Internet.  Well, Microsoft has a lot to do with realtime

5   transactions on the Internet.  They came to us; we didn't

6   approach them.

7      Second, they sued three customers.  The only thing

8   these three customers had in common, Dell, FedEx, and Allstate

9   was that they used our Visual Studio software to create web

10  services.  These are not three random customers using three

11  different companies' software; they all used our software.  And

12  they worked independently.  And, lo and behold, working

13  independently, using our software, they supposedly infringed.

14     And we have pled in the complaint that there are

15  thousands of customers just like them using our software to do

16  the same thing that they accuse of infringement.  So, that was

17  the second thing they did.

18     The third thing they did was when they did the

19  infringement contentions against these customers, they pointed

20  to our technology.  They pointed, for instance, basically to

21  the web services and to the SOAP standard that we support in

22  our technology.  They didn't point to something that Dell was

23  doing uniquely of everyone else, or that FedEx was doing

24  uniquely, or Allstate. What they pointed to was stuff,

25  technology, that we provide and support.  That was third.

1          The fourth thing they did was their Exhibit A --

2   might have been Exhibit 2, but their Exhibit A to our

3   infringement contentions was our case study that we published

4   on our website as a model use of our software.

5          So, when I mention business as usual, our business

6   as usual is to include web services templates and these tools

7   for creating SOAP web services.  And, our business as usual is

8   to then tell our customers in the world the best uses, model

9   uses.  And we pointed to these, Dell, Allstate and FedEx as

10  model software.  So our business as usual is to give customers

11  this technology and to tell them that these are model ways of

12  using the technology.  And they are pointing to that as

13  evidence of infringement.  So their Exhibit A of infringement

14  is our Exhibit A of a model use.  That is a conflict, we didn't

15  just say --

16          **THE COURT:**  But counsel just said that your program,

17  in and of itself, does not infringe anything, at least any of

18  their patents.

19          **MR. VANDENBERG:**  Yes.

20          **THE COURT:**  And secondly, that they have no evidence

21  to accuse Microsoft of inducing others to infringe.

22          **MR. VANDENBERG:**  Well --

23          **THE COURT:**  Why aren't you happy?  And why don't you

24  take that and go home?

25          **MR. VANDENBERG:**  Because six years from now they can

```
1   turn around and sue us for six years, subject to laches but six
2   years from now they can come back and sue us for inducement
3   infringement, seek treble damages for the last six years of our
4   promoting web services and providing software.  And what they
5   can attach to their infringement contention would be our case
6   study, the exact same documents we are talking about today.
7   There is nothing to stop them from doing that because --
8                THE COURT:  But they know about that case study.
9            MR. VANDENBERG:  Well, what they are hanging their
10  hat on is for inducement they essentially have to show three
11  things -- four things.  They have to show we know about the
12  patents, they put us on notice; they have to show there is a
13  direct infringement; they have to show that somehow we were
14  involved in causing or encouraging the direct infringement.
15               They can turn around six years from now and say that
16  our case studies have induced others -- our case study about
17  Dell, did not induce Dell, but if they find out some other
18  customer who happened to look at the Dell case study and say,
19  hey, we want to do that, too --
20               THE COURT:  So you want them to just -- maybe I'll
21  ask: tell me how to phrase the question.
22           MR. VANDENBERG:  Well, let's say --
23           THE COURT:  Because maybe he'll just stand up right
24  now and say we give that up now, we covenant not to sue us for
25  inducing infringement based on technology -- I guess we can
```

1  fall back and based on actions that we have taken up to now.  I

2  mean, clearly, if we do something in the future that's brand

3  new, then perhaps they don't need a covenant -- covenant not to

4  sues us for inducing infringement based on any action that

5  Microsoft has taken to date.

6          All right, will you --

7          **MR. TOREN:**  I will -- web Exchange will covenant not

8  to sue Microsoft for inducement based on the case studies.  And

9  it will agree not to base any claim for inducement on the use

10  of the case studies.  Again, what happens in the future, Your

11  Honor, I don't have a crystal ball, I can't say what --

12          **THE COURT:**  But even in the future you won't rely on

13  the case studies.

14          **MR. TOREN:**  I will covenant not to rely on the case

15  studies in any case of inducement against Microsoft.

16          **THE COURT:**  What's wrong with that?

17          **MR. VANDENBERG:**  That's part of the -- that's

18  closer.  But the situation is our software has web services

19  templates, they know that; we pled it in the allegation.  So

20  it's not simply our case studies, but it's our actual software.

21  I mean, if they can covenant not to sue us for inducing

22  infringement based on anything we've done to date, namely,

23  software that we have issued -- but that only solves one of the

24  two injuries.

25          We have been injured in two ways, we submit.  And we

```
 1   have this -- and this is not tens of thousands of dollars, we

 2   are talking about e-commerce on the web.  Their allegation is

 3   they basically cover a large swath of e-commerce on the web,

 4   Dell alone, if I'm not mistaken, had something like 30,000

 5   sales representatives using this.

 6              I don't have the exact number, but these customers

 7   are using web services technology provided by Microsoft to

 8   sell, you know, tens of billion of dollars of Dell computers.

 9   This is important to web commerce.  And so we have been

10   providing that technology.

11              So the first harm is a real risk of inducement,

12   treble damages, liability.  The other one is indemnification.

13   So far, we are batting a thousand:  Every customer they have

14   sued has sought indemnification from us.

15         THE COURT:  Why don't you litigate one of those

16   cases and get these patents thrown out?

17         MR. VANDENBERG:  Well --

18         THE COURT:  If they are so bogus -- anyone who

19   claims that they own all commerce on the Internet, that's too

20   broad.  You can get that thrown out.

21         MR. VANDENBERG:  We are confident we can, but

22   that --

23         THE COURT:  Just do that in Delaware.  Why do you

24   sue here?

25         MR. VANDENBERG:  First of all, we tried to talk to
```

1    them and they refused to talk to us, so we are forced to being

2    in court.

3            They are claiming there is no subject matter

4    jurisdiction that would apply in Delaware or in California.

5    Their main objection is that somehow we're not being injured;

6    our position is we are.

7            In terms of this forum, they have conceded venue.

8    They have not objected on venue.  They have not --

9            *THE COURT:*  I'm not talking about the Delaware.  Why

10   can't you just take over the Delaware case?  They tendered it

11   to you.  That is a great forum.  You could litigate all day

12   long there.

13           *MR. VANDENBERG:*  Well, partly because this is a more

14   natural forum for resolving it because the patent applicant

15   lives in Menlo Park. The patent prosecutors are down the road

16   as well. Webxchange's business is here.  We don't know if any

17   of their employees are going to be relevant fact witnesses, but

18   they may be.

19           *THE COURT:*  Well, Webxchange has submitted to the

20   jurisdiction in Delaware.  They sued there.  You could take

21   over one of those cases that were tendered to you, or all of

22   them, and litigate huckledy-buck back in Delaware where you got

23   a real concrete case.

24           *MR. VANDENBERG:*  Well, it's not clear that we can

25   because they are objecting to subject matter jurisdiction.

```
 1                    But secondly, if we could --

 2               THE COURT:  How can they do that?  They sued in

 3       Delaware.

 4               MR. VANDENBERG:  Right, but they'll say they didn't

 5       sue us.  They'll make the same arguments that they're making in

 6       their motion here.

 7               THE COURT:  But when someone tenders a defense, you

 8       said that they tendered the defense to you, not Webxchange, but

 9       the accused infringers --

10               MR. VANDENBERG:  That's true.

11               THE COURT:  You have the right to come in and take

12       over the defense.  It's like an insurance company.

13               MR. VANDENBERG:  Yes, I agree with that.

14               THE COURT:  So how could they possibly object to you

15       doing that?

16               MR. VANDENBERG:  If we took over the defense, yes,

17       we would need to do that.

18               THE COURT:  Okay.

19               MR. VANDENBERG:  But the other point is in Delaware

20       we can't subpoena Webxchange employees, can't subpoena the

21       patent prosecutors, we can't even subpoena the applicant.

22               THE COURT:  You could just notice their depositions.

23               MR. VANDENBERG:  Right, but for trial, for trial.

24               So, and also, as far as convenience, their employees

25       and their principal and the patent applicant are in Menlo Park,
```

```
1    Microsoft is on the West Coast.  There is nothing about the

2    Delaware forum that would be convenient.  And again, they

3    haven't even moved the transfer, and they haven't objected to

4    venue.

5            So our position is that on subject-matter

6    jurisdiction, we have these two harms that they have caused,

7    the inducement, but then indemnification.  It's three customers

8    who did this independently, got sued for infringement.  It

9    wasn't anything -- they haven't pointed to anything that Dell

10   did differently than thousands of our other customers.

11           If they came in and said, oh, there is only three

12   customers, and they are in trouble because they did something

13   really weird, that would be a different case.  But all they

14   have done is sued three customers who use web services.  And

15   they haven't pointed to anything special that those customers

16   are doing, therefore, we face indemnification obligations for

17   their next 3 or 300 targets.

18           So, in terms of just actual controversy, it seems

19   plain, we submit, that we are facing this risk of huge exposure

20   for indemnification and possibly huge exposure for --

21           THE COURT:  And every single case is going to turn

22   on whether or not that particular application infringes the

23   Webxchange patents.

24           MR. VANDENBERG:  Well, that's the problem with the

25   Delaware case.  The Delaware case -- most cases, of course,
```

1  settle, so one reason this is the best forum and we are the

2  best party to fight this fight, is we have more incentive to

3  fight this than any other customer because we are defending our

4  business for thousands of customers.  If we settle the case, we

5  are going to take care of our customers, that is just common

6  sense.  So our settlement will be universal.

7          If Dell settles, they are not going to take care of

8  Gateway or HP or anybody else in the world, they're just going

9  to take care of Dell.  So if -- they've asked to stay this

10 case; that would not resolve anything.  You would have three

11 customers who would have an incentive to settle for the cost of

12 litigation.  Settlements wouldn't help anyone else.  If we get

13 into this, we are not going to settle lightly, we are going to

14 fight it --

15          **THE COURT:**  You could still fight it.  You could say

16 to one of customers in Delaware, we will indemnify you.  We

17 take over the defense.  If you lose this case, we'll pay for it

18 but we are going to go and try to prove that these patents are

19 invalid.  I don't see why that is not a perfectly good solution

20 for you.

21          **MR. VANDENBERG:**  Well, that, again, goes to what is

22 the best forum for the litigation.  And our position is this is

23 the most convenient forum for all the parties.

24          **THE COURT:**  For Microsoft it might be, but they

25 chose Delaware.

```
 1              MR. VANDENBERG:  Well, for the third-party witnesses
 2     as well; we can't force their employees -- and I concede I
 3     don't have the name --
 4              THE COURT:  Take a videotaped deposition and play
 5     that at trial.
 6              MR. VANDENBERG:  Well, but in transfer cases courts
 7     certainly do consider, despite video depositions, the
 8     convenience of the parties, convenience of the third-party
 9     witnesses.
10              THE COURT:  This is not a transfer motion, is it?
11              MR. VANDENBERG:  No, it's not, but the same
12     considerations would apply in determining whether or not to
13     stay this case or to decline jurisdiction on discretionary
14     grounds.  It would seem the Court can fairly consider issues
15     that overlap with the transfer-type motion, namely, is this the
16     best forum for the case.
17              And, again, we submit that this is the perfect forum
18     for the case, not only because it's where the patent
19     application was essentially prosecuted from and the alleged
20     invention was done and the alleged inventor is located and all
21     her employees, but also for Microsoft.
22              THE COURT:  Are you trying -- in this case, are you
23     trying to get anything are you trying to go beyond --
24              MR. VANDENBERG:  Yes.  Our complaint states claims
25     of invalidity and unenforceability due to inequitable conduct.
```

1   And I know inequitable conduct is pled a lot, but we have

2   specified in great detail the prior art that the applicant

3   copied verbatim and didn't tell the Patent Office about and

4   other grounds for inequitable conduct.  That activity, of

5   course, was in the Patent Office, but it was coming from Menlo

6   Park.

7          **THE COURT:**  Do you have any other grounds for

8   invalidity?

9          **MR. VANDENBERG:**  Invalidity grounds are essentially

10  invalidity based on prior art, we submit, but can't point

11  specifically, with a few exceptions, to prior art that is based

12  in the Bay Area.  One prior art reference we have already

13  submitted to the Patent Office in re-exam is the Gincher

14  *(phonetic)* reference of Intertrust Corporation, who is based on

15  the West Coast here.

16         In essence, this is one reason people sue here, is

17  not simply, you know, just because of the factors Your Honor

18  indicated that the courts here are comfortable invalidating

19  invalid patents, but also, this is the center of technology.

20         **THE COURT:**  I didn't go that far.

21         **MR. VANDENBERG:**  Okay.

22         **THE COURT:**  I just said we are prepared to entertain

23  the idea that a patent may be invalid.

24         If you look at the statistics, there are slightly

25  more cases where a patent gets declared invalid here than

1   anywhere else in the country. That's probably true. But that

2   doesn't mean that we believe patents are invalid here, it just

3   means that we recognize that some patents are invalid.

4         **MR. VANDENBERG:**  Perhaps I misspoke.  What I meant

5   to articulate is that the Court is prepared to invalidate

6   invalid patents is what I meant to say.

7         So, but there are other perfectly legitimate reasons

8   to be here.  This is an be important case to web commerce, and

9   this is the technology center for the Web, and therefore, there

10  is a public policy.  This is -- web commerce is important to

11  this district --

12        **THE COURT:**  That's true; that's true for the whole

13  country.

14        **MR. VANDENBERG:**  It's not dispositive, but it's

15  another factor why this is a reasonable case.

16        In terms of discretion, the Court's -- obviously

17  declaratory judgment is discretionary; however, it's not

18  without limits.

19        **THE COURT:**  I forgot to ask you one other question.

20        Do you contend anything beyond invalidity and

21  enforceability?  In other words, are you going to be trying to

22  say, okay, Dell doesn't even infringe?

23        **MR. VANDENBERG:**  Okay oh, we are certainly saying

24  non-infringement.  But the focus is -- our customers are not

25  directly infringing, and the reason is --

1     **THE COURT:**  I can tell you now, there is no way you

2     are going to get me to start looking at Dell and all those

3     other companies to see if their products -- that is a

4     nonstarter.

5          **MR. VANDENBERG:**  We don't need to look at their

6     products.

7          **THE COURT:**  No, not need to -- you would have to

8     disavow that totally.  See, this is just a gimmick by you to

9     take all those cases and MDL them here.  It's like MDL, shift

10    it out of Delaware, and you are going to litigate it here.

11    There is no way you are going to be allowed to do that.

12         **MR. VANDENBERG:**  Can I --

13         **THE COURT:**  Explain that --

14         **MR. VANDENBERG:**  Explain --

15         **THE COURT:**  You had at least a semblance a

16    plausibility until now I learned you want to litigate

17    non-infringement here.

18         **MR. VANDENBERG:**  Well, but there is several aspects

19    of non-infringement.  And I believe the parts that you are

20    concerned about we are not going to litigate.  We couldn't,

21    obviously.

22         Let me explain that.  They have pointed in their

23    papers, they put in an expert declaration, I believe it was

24    Bardash *(phonetic)*, but I may have the name wrong, and they

25    pointed to three things that these patents require that Visual

```
 1   Studio doesn't -- you don't have to use Visual Studio that way.
 2   Basically, what they said is the patents require to use it on a
 3   network, that the Web service is on a network, that there be
 4   multiple computers involved, that it be a commercial service.
 5   Well, we are willing to stipulate that some of our customers do
 6   all of that, right?  I mean, we are talking about web service,
 7   obviously, it's a network.
 8           THE COURT:  Why can't that all -- what your
 9   customers do and not do -- this would be the most bizarre
10   lawsuit in America.  All of those issues are being litigated in
11   Delaware, and you are asking me to supersede whatever the
12   district judge is doing in Delaware to start talking about what
13   your customers do and not do.
14           You know, it was remotely plausible that I could
15   say, okay, you have an interest in deciding whether these
16   patents are invalid, but to go beyond invalidity would be a
17   nonstarter.  I'm not going to do that.
18           MR. VANDENBERG:  Well, but --
19           THE COURT:  That would be interfering with the
20   district judge in Delaware.
21           MR. VANDENBERG:  But the non-infringement that we
22   are talking about is based entirely on our technology.  We
23   would not point to anything --
24           THE COURT:  No way you are going to get into
25   non-infringement.
```

1          **MR. VANDENBERG:**  Well --

2          **THE COURT:**  I'm just telling you, that would be --

3    that would overlap so much with what is going on in Delaware.

4          **MR. VANDENBERG:**  If I could propose, then --

5          **THE COURT:**  You can propose whatever you want to,

6    but that's just -- I am not going to interfere with a pending

7    case before a Delaware judge.

8          **MR. VANDENBERG:**  What we would propose, then, is

9    that we stay all issues of infringement and damages in this

10   case, and that we proceed in a quick manner.

11         **THE COURT:**  No, because then the Delaware judge

12   would say that crazy judge in California, he stayed it for now,

13   but next month he'll be acting on that, too.

14         I don't know; I don't see why you can't just go

15   defend one of those cases in Delaware.  If these patents are

16   invalid, the judges back there are outstanding, they would

17   knock it out.  They declare patents invalid.

18         **MR. VANDENBERG:**  Not suggesting otherwise, just

19   saying that there really is three issues. There is: Is there

20   jurisdiction?  Matter of discretion, take a declaratory

21   judgment?  And then, the stay motion.

22         In terms of is there jurisdiction?  Is there an

23   actual controversy?  We have briefed that and argued that and

24   we submit that because of their actions, we are being harmed on

25   indemnification and inducement.  We are facing real risk.

1            They refuse to covenant not to sue based on our

2    actions up to present.  They won't go that far.  And, they

3    refuse to stipulate that what we propose in our case studies is

4    non-infringing.  And therefore, we are betting part of the

5    farm.  If Your Honor grants their motion and we walk out today,

6    then we are betting part of the farm.  We are saying, okay,

7    tomorrow, do we continue publishing these case studies and

8    putting web services templates in our software at the risk of

9    more indemnification risk and inducement?  So, we submit under

10   the case law that that satisfies actual -- actual controversy.

11            The next question, then, is discretion.  The Court

12   does have some limited discretion to decline, of course,

13   declaratory judgment, but *SanDisk*, the Federal Circuit

14   decision, said that if there is actually a controversy, usually

15   the Court should take discretion.  And if the purposes of the

16   declaratory judgment act would be served by taking the case,

17   then the Court should take the case.

18            And then, the third question is stay.  They have

19   moved to stay, and we are -- we can agree to staying damages.

20   They talked about burden; they have to take discovery of

21   thousand of customers.  To prove liability by us, they don't

22   need discovery from thousands of customers; they only need to

23   prove one instance of a customer that we supposedly induced,

24   and that would be liability.

25            So we would stay damages, stay infringement, and

1   just have an expedited, you know, simple, streamlined -- we

2   would agree to limit the number of depositions.  We are not

3   trying to -- to, you know, spend a lot of money, we are trying

4   to just save a lot of money, both for ourselves and for all

5   these customers.

6             **THE COURT:**  All right, let me give the other side a

7   brief rebuttal, then we got to move on.  Thank you.

8             **MR. TOREN:**  Thank you, Your Honor.  I'll be very

9   brief.

10            This case in this jurisdiction would really solve

11  nothing.  We would, we've already stated that up to this point

12  we have no evidence that Microsoft has in -- that Microsoft has

13  induced infringement of Web Exchange patents.  The question is

14  whether or not Microsoft's customers have infringed Web

15  Exchange patents.  And that goes far beyond whether or not

16  they've actually used Microsoft Visual Studio.  It goes to what

17  they have done with Visual Studio.

18            And each case, each of these thousands of cases that

19  plaintiff's counsel talks about, depends on what each

20  individual customer has done with Microsoft Visual Studio.

21            So this case is infringement, and here on inducement

22  would solve, really, nothing.  Even if Your Honor were to find,

23  the jury were to find that there is no inducement by Microsoft,

24  that would not prevent Web Exchange from going out and suing

25  all of -- all of Microsoft's customers.

1          There is nothing that would prevent us from doing

2     that, Your Honor.  Microsoft is inappropriately attempting to

3     protect its own economic interests here.  Microsoft certainly

4     has a right to be able to freely sell its Microsoft Visual

5     Studio fair -- free from fear that Web Exchange is going to sue

6     Microsoft for infringement for the use and sale of Microsoft

7     Visual Studio.

8          And I've stated today, Your Honor, that we have no

9     evidence of such infringement, and we are not going to do so.

10    The question is whether Microsoft's customers who use that --

11    and not just Microsoft's customers, Your Honor, there may be

12    other companies out there that are also infringing.

13         **THE COURT:**  How many Microsoft customers have you

14    sued?

15         **MR. TOREN:**  Just three, Your Honor.  And at this

16    point we have no intent -- I mean, just the idea -- and to give

17    you an idea of what -- of what these cases would be involved.

18         This is something that we haven't done, literally.

19    I mean, we have to review all the source code that -- for Dell,

20    for Allstate, for FedEx.  These are not simple cases, Your

21    Honor, by simply saying, well, they are using Microsoft Visual

22    Studio, ergo, they infringe.  This is to look at the exact

23    systems that each of these defendants are using and to prove

24    infringement based on the actual -- that actual use, the way

25    those systems are operating, not the way Microsoft Visual

1    Studio operates.

2              Second of all, Your Honor, Your Honor asked

3    questions about what are the other cause of action about

4    inequitable conduct and such, those causes of action by

5    themselves do not give rise to a controversy for subject matter

6    jurisdiction, in and of themselves.  If there is no imminent

7    harm, if there is no subject matter jurisdiction based on

8    inducement, the cases are quite clear that there cannot be

9    subject matter jurisdiction simply based on a claim for

10   inequitable conduct.  And we've cited those cases in our brief,

11   Your Honor.  So, without the basis for subject matter

12   jurisdiction on inducement --

13             **THE COURT:**  But they also have invalidity in there,

14   don't they?

15             **MR. TOREN:**  Yes.  And the cases we have also

16   cited -- the cases are exactly the same.  If there was subject

17   matter jurisdiction on invalidity, then anybody anywhere in the

18   United States who was remotely interested or remotely harmed by

19   some patent then would be able to claim invalidity.  It would

20   basically gut the subject matter -- basically gut the

21   Declaratory Judgment Act, and there is no basis for that.  And

22   we cited cases to that effect in our brief, Your Honor.

23             **THE COURT:**  Are all of these cases in Delaware, and

24   are they all before one judge?

25             **MR. TOREN:**  Yes, Your Honor, they are all --

1          **THE COURT:**  Who is that?

2          **MR. TOREN:**  Judge Farnan, Your Honor.

3          **THE COURT:**  All right.

4          **MR. TOREN:**  On that, one thing that has come up

5    since our briefing schedule was Judge Farnan has set a fairly

6    expeditious schedule in that matter.  There is a Markman now

7    that is scheduled for some time in April.  I don't have the

8    exact date in front of me, but we can make the Court -- we can

9    provide the Court with copies of the expedited -- or the

10   schedule in that case.

11         So, those cases are all going before Judge Farnan.

12   There is a single Markman hearing in that case, Your Honor.

13   Discovery is set to close this summer.  It's proceeding at

14   pace.  And, there is simply no reason, with due respect, Your

15   Honor, for us to be in your courtroom after today.

16         Unless you have any further questions, I have

17   nothing to add.

18         **THE COURT:**  No, thank you very much.

19         **MR. VANDENBERG:**  Can I just have thirty seconds,

20   Your Honor?

21         **THE COURT:**  All right, thirty seconds.

22         **MR. VANDENBERG:**  In terms of the proposal to stay on

23   infringement, we would go one better and be willing to amend

24   the claim to assert only invalidity and unenforceability, so

25   there would be no concern that somehow infringement would or

1   will slip in later.

2          The infringement risk, the inducement risk would

3   give the court case over controversy, but the issues would be

4   limited to invalidity and unenforceability, which we submit

5   this is the best forum for the reasons previously stated.

6          **THE COURT:**  All right, thank you.  I'll get an order

7   out soon.

8          **MR. TOREN:**  Thank you, Your Honor.

9          **THE COURT:**  So long.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## <u>CERTIFICATE OF REPORTER</u>

I, Sahar McVickar, Official Court Reporter for the United States Court, Northern District of California, hereby certify that the foregoing proceedings were reported by me, a certified shorthand reporter, and were thereafter transcribed under my direction into typewriting; that the foregoing is a full, complete and true record of said proceedings as bound by me at the time of filing.  The validity of the reporter's certification of said transcript may be void upon disassembly and/or removal from the court file.


/s/ Sahar McVickar
_____

Sahar McVickar, RPR, CSR No. 12963

Thursday, February 12, 2009